UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
                       :

**WINSTON D. VOGEL**,
                       :

             Plaintiff,   :

                       :   **MEMORANDUM DECISION AND
ORDER**

     – against –       :

                       :   19-CV-1734 (AMD) (RER)

**LOUIS R. ROSENTHAL**,
                       :

            Defendant.  :

------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

The plaintiff alleges that the defendant committed legal malpractice in the plaintiff's

dispute with his sister, Ruth Vogel. (ECF No. 29.) Before the Court is the defendant's motion

for summary judgment. (ECF No. 35.) For the reasons explained below, the motion is granted

in part and denied in part.

### BACKGROUND[1]

This legal malpractice action arises out of years of litigation in New York and Israel,

stemming from a dispute between the plaintiff and his sister over an apartment that they owned

on Central Park South in New York City. (ECF No. 39-8, Plaintiff's Rule 56.1 Counterstatement

("56.1") ¶ 3.)

In 2008, the plaintiff sued his sister in New York Supreme Court, New York County. He

claimed that she forged his signature on a May 2008 deed, and then fraudulently transferred his

interest in the apartment to herself (the "state action"). (56.1 ¶¶ 4-5; ECF No. 37-3.)

---

[1] The facts set forth in this section are based on the defendant's Rule 56.1 statement, the plaintiff's Rule
56.1 counterstatement and the exhibits attached to the defendant's motion and the plaintiff's opposition.
*See* Southern and Eastern Districts of New York Local Civil Rule 56.1(a); Fed. R. Civ. P. 56(c)(1)(A) &
(3).

In November 2011, the parties had a bench trial before Justice Debra A. James, who invalidated the May 2008 deed.  (ECF No. 37-3 at 3.)  The court determined that the plaintiff had a 29.75% ownership interest in the apartment, and that Ms. Vogel had a 70.25% interest.  (*Id.* at 4.)  The court authorized Ms. Vogel to sell the apartment, and directed her and the plaintiff "immediately" to "take whatever steps are necessary to restore title . . . to both Winston and Ruth as tenants in common."  (*Id.* at 3-4.)  Because Ms. Vogel did not comply with the order, the court appointed a referee to implement the order.  (56.1 ¶¶ 7, 9; ECF No. 37-5.)

In May 2014, the plaintiff and his sister entered into a settlement agreement in Israel (the "Israeli settlement agreement"), which purported to resolve their disagreements about the apartment and another property in Israel.  (ECF No. 37-6.)  As for the apartment, Ms. Vogel agreed to pay the plaintiff $200,000 in exchange for his 29.75% ownership interest.  (56.1 ¶ 11; ECF No. 37-6 at 4.)  In addition, she agreed to "bear the costs of the transaction in New York including the fees of the receiver . . . up to the amount of [] $15,000.  In the event of the amount of the expenses exceeding the sum, [Mr. Vogel] and [Ms. Vogel] will bear the additional amount of the expenses, in equal shared."  (56.1 ¶ 11; ECF No. 37-6 at 5.)  The agreement also provided: "All costs relating to the registration of the Property in [Ms. Vogel's] name, will be borne by [Ms. Vogel]."  (56.1 ¶ 11; ECF No. 37-6 at 5.)  Ms. Vogel moved before the Ramat Gan Family Court in Tel Aviv, Israel, to enforce the terms of the agreement.  (ECF No. 37-17 at 2.)  On May 14, 2014, the Israeli court found that the agreement was a valid and enforceable contract and converted it into a final judgment.  (56.1 ¶ 10; ECF No. 37-6 at 2.)

The state action was at that point still active.  The court appointed Referee Ira Gammerman to determine the legal fees that were owed to the plaintiff's previous counsel for his representation of the plaintiff in the state action.  (56.1 ¶¶ 14-15.)  After a hearing, the referee

recommended awarding the plaintiff's counsel a charging lien of $35,558, to be deducted from

the money that Ms. Vogel was to pay the plaintiff under the Israeli settlement agreement. (56.1

¶¶ 15-16; ECF No. 37-10 at 2.) After the court relieved the plaintiff's counsel, the plaintiff hired

the defendant to represent him on September 15, 2014. (56.1 ¶¶ 14, 18; ECF No. 37-11.) The

plaintiff and the defendant signed a retention agreement in which they agreed that the plaintiff

was retaining the defendant:

> to represent him in a matter concerning the legal issues with respect to protecting
> his share of a condominium apartment 10A at 116 Central Park South, New York
> and obtaining the highest possible payment for his share notwithstanding a prior
> stipulation entered into between client and sister (owner of 70.25 per cent).

(ECF No. 37-11 at 2.) The plaintiff and defendant further agreed that the defendant would

"review the decision of Referee Ira Gammerman with respect to the legal fees awarded to

Graubard and Miller from the Client and attempt to either re-litigate or settle the matter."

Finally, the defendant's "legal work include[d] all necessary court appearances, research,

investigation, correspondence, preparation and drafting of pleadings and other legal documents,

trial preparation, conferences in person and by telephone with Clients and with others, and

related work to properly represent Clients in this matter." (*Id.*) The plaintiff informed the

defendant by email that he had also retained an attorney in Israel for the purposes of "challenging

[the] Israeli court's ruling." (ECF No. 37-12 at 2.)

The defendant advised the plaintiff that the Israeli settlement agreement was enforceable

before an October 21, 2014 court appearance in the state action:

> Unfortunately you entered into a written stipulation agreement and unless your
> signature was forged to the agreement, you settled the matter of the New York
> apartment for $200,000.00. There is no viable way to challenge this settlement.
> The fact that you are appealing the confirming order of the Israeli court is of no
> moment. My notes of our meetings indicate that you told me that it was the decision
> of the mediator that gave you only $200,000.00. The written documents indicate
> that you in fact settled the dispute with your sister during the mediation. The

settlement is enforceable, and if the apartment is worth the appraisal, the settlement is not unconscionable. I will see you in court tomorrow and will advise you to conclude the matter at that time.

(56.1 ¶ 23; ECF No. 37-15 at 3.) The plaintiff responded that the defendant should call his lawyer in Israel, who, according to the plaintiff, was trying to invalidate the Israeli settlement agreement. (ECF No. 37-15 at 2.)[2] The defendant replied, "The plain fact is that you signed a stipulation settling the matter. The Israel [court] is just enforcing the contract as the court in NY will." (*Id.*)

On October 27, 2014, the court in the state action found that the Israeli settlement agreement was enforceable—that there was no dispute that the plaintiff agreed to mediate his dispute with his sister in Israeli court (ECF No. 37-16 at 2), or that the plaintiff and his sister executed an agreement that the Israeli court had converted into a final judgment. (*Id.* at 2-3; ECF No. 37-6.) The court explained that the judgment was enforceable under principles of comity, and that the plaintiff had not shown that there were jurisdictional defects in the Israel court's decision or that public policy concerns weighed against enforcing the agreement. (ECF No. 37-16 at 3-4 ("Plaintiff does not contest that the Israeli court had personal jurisdiction over him or raise any public policy arguments that militate against enforcement . . . .").) Accordingly, the court required the plaintiff to "accept the payment of [$200,000] . . . in exchange for his execution and delivery of a deed and all other documents necessary to transfer and convey his 29.75% ownership in" the apartment. (ECF No. 37-16 at 4.) On November 22, 2014, the defendant advised the plaintiff that the state action was "over," and that the plaintiff should

---

[2] Although the plaintiff told the defendant in his October 2014 email that his lawyer in Israel had challenged the Israeli settlement agreement in an appeal (ECF No. 37-15 at 2), the documents do not confirm that the plaintiff's Israel counsel had, in fact, done so; the defendant maintains that, as of November 22, 2014, he had not received any proof that an appeal had been filed. (Def.'s Rule 56.1 Statement, ECF No. 36 ¶ 30.)

"execute documents" transferring his interest in the apartment to his sister as soon as possible. (56.1 ¶ 31; ECF No. 37-19 at 2.)

When the plaintiff did not transfer his interest in the apartment to his sister, she moved for an order of contempt. (ECF No. 37-23 at 2.) On February 2, 2015, the court directed the plaintiff to show cause by February 24, 2015 why he should not be held in contempt. (ECF No. 37-20 at 3 (directing the plaintiff to show cause why an order should not be entered "punishing [the plaintiff] for civil contempt for his willful disobedience of the Court's lawful Order by failing and refusing to execute and deliver a deed and all other necessary documents necessary to transfer and convey his interest in the Unit to Ruth").) According to the order, the plaintiff's "answering papers, if any," were due by February 18, 2015. (*Id.* at 4.)

The record does not show that the defendant filed a written opposition to the contempt motion. (ECF No. 37-23 at 4.) Nor are the minutes or transcript from the show cause hearing in the record. However, the plaintiff seems to have been aware of the contempt motion as well as the hearing. The defendant testified that he told the plaintiff about the contempt motion and emailed him a copy. (ECF No. 37-34 at 222-23.) The day before the show cause hearing, the plaintiff who was in Israel told the defendant: "You know what to say, I hope you will be given a chance to say it. I want a positive result – postponement till Israeli Court makes a final decision, in May or after. If they insist I am arrested I shall come and be arrested." (ECF No. 37-22 at 2.)

On June 15, 2015, the court held the plaintiff in contempt and appointed a receiver to implement the transfer of the plaintiff's interest in the apartment to his sister (56.1 ¶ 36; ECF No. 37-23.) The court also ordered the plaintiff to pay damages to his sister, including for a portion of monthly apartment expenses incurred since October 27, 2014, and for reasonable

attorneys' fees and costs associated with her litigation of the contempt motion.  (ECF No. 37-23 at 5.)

The court gave the plaintiff until July 30, 2015 to "purge" his contempt (*id.* at 4), but he did not do so.  Emails between the plaintiff and the defendant suggest that the plaintiff was awaiting a ruling from the Israeli court on his appeal.  (56.1 ¶¶ 42-46.)  The plaintiff wrote in a July 31, 2015 email, "I really will not sign a paper based on their demands and I am willing to be put in jail for that."  (56.1 ¶ 45; ECF No. 37-26 at 2.)  The receiver transferred the plaintiff's interest in the apartment to his sister on January 6, 2016.  (56.1 ¶ 47; ECF No. 37-28.)[3]

A special referee held a hearing on March 17, 2016 to determine how much the plaintiff owed his sister pursuant to the June 15, 2015 contempt order.  (ECF No. 37-31.)  At that hearing, which the defendant attended, the plaintiff agreed to pay his sister $62,338.19 in damages.  (*Id.* at 6; *see also* 56.1 ¶¶ 52-53.)[4]  Although the plaintiff alleges that the defendant "did not dispute or otherwise take any action to minimize the contempt damages," and that the defendant "coerced" him into "agreeing to pay all of Ms. Vogel's financial demands" (ECF No. 29 ¶¶ 64-67), the plaintiff confirmed at the hearing that he understood the terms of the settlement, that he accepted the agreement of his own volition and that he was not being forced into accepting it.  (ECF No. 37-31 at 8-19.)  Accordingly, the special referee accepted the plaintiff's allocution and concluded that "the parties ha[d] reached an agreement under their own free will."  (*Id.* at 18.)

---

[3] On January 22, 2016, the plaintiff emailed the defendant that he had "lost [his] quest to change the ruling, meaning the Judge will not change the ruling of the court that renders [him] culpable to surrender the properties."  (ECF No. 37-29 at 2.)

[4] The damages were to be deducted from the money that Ms. Vogel paid the receiver under the Israeli settlement agreement.  (ECF No. 37-31 at 7-8.)  Ms. Vogel had initially transferred $200,000, and the receiver held $153,529.62 in the account as of the date of the March 17, 2016 damages hearing.  (*Id.*)  After deducting $62,338.19, there was a balance of $91,191.43 in the receiver's account.  (*Id.*; *see also* 56.1 ¶ 55.)

On August 18, 2017, the receiver submitted an affidavit in the state action in support of her motion for an accounting of settlement transaction costs. (56.1 ¶ 56; ECF No. 37-33.) The plaintiff seems to argue that the receiver's application was in the defendant's "file," while the defendant testified that he did not "recall seeing" the motion. (ECF No. 37-24 at 252-55.) The plaintiff did not respond to the receiver's motion in a timely fashion. (56.1 ¶ 58; ECF No. 29 ¶ 75.) However, before the court decided the receiver's motion, the plaintiff retained new counsel, Doron Zanani, who moved to vacate the plaintiff's default and also to oppose the accounting. (56.1 ¶ 58.)

In May 2018, the court vacated the default but approved the receiver's accounting. (ECF No. 37-38.) Thus, under the final accounting order, $10,200.00 would be awarded to the receiver, the initial referee would receive $3,869.66, the successor referee would receive $750 and counsel for the receiver would be awarded $8,372.95 in attorney's fees. (*Id.* at 4-5.) These fees totaled $23,192.61 and were to be withdrawn from the plaintiff's funds, leaving $64,528.82 remaining in the receiver's account—which the court directed the receiver to deposit with the Clerk of Court for distribution to the plaintiff. (*Id.* at 4-5.)

The plaintiff—represented by Mr. Zanani—appealed the accounting order to the Appellate Division, First Department. (56.1 ¶ 64.) The Appellate Division concluded that the payments to the referees were appropriate, but reduced the receiver award to $7,162.50 and found that the receiver's lawyers were not entitled to an award. *See Vogel v. Vogel*, 172 A.D.3d 464 (1st Dep't 2019); (ECF No. 37-39.) Thus, the court reduced the accounting total from $23,192.61 to $11,782.16. In addition, the court held that Ms. Vogel rather than the plaintiff was responsible for the first $15,000 of the settlement expenses pursuant to the terms of the Israeli

settlement agreement, and that the parties would split costs above $15,000.00.  *See Vogel*, 172 A.D.3d at 466.

On July 19, 2019, the plaintiff moved for an order directing the New York City Department of Finance to pay him $64,528.82 plus interest.  (56.1 ¶ 66; ECF No. 37-40.)  He also claimed that he was entitled to $17,864.54[5] with interest from his sister, which included $11,782.16 in transaction costs that his sister agreed to pay under the Israeli settlement agreement and an additional $6,082.38 in "registration costs."  (56.1 ¶ 66; ECF Nos. 37-40, 37-35 at 9.)  Finally, the plaintiff moved for sanctions, contending that his sister "engag[ed] in conduct that is completely without merit in law or fact."  (56.1 ¶ 66; ECF No. 37-40.)  On April 28, 2020, the court ordered the New York City Department of Finance to release the funds to him, granted him a $17,864.54 judgment, but rejected his motion for sanctions.  (56.1 ¶ 67; ECF No. 37-35.)[6]

On February 25, 2021, the plaintiff filed an amended complaint ("AC") in this case, alleging that the defendant violated various rules of professional conduct, and asserting legal malpractice under multiple theories.  (ECF No. 29.)   First, the plaintiff claims that the defendant committed malpractice by not fulfilling his obligations under the retainer agreement; specifically, he alleges that the defendant did not draft and execute the documents needed to transfer the plaintiff's interest to his sister and ensure the plaintiff would receive the money she owed him under the Israeli settlement agreement.  (*Id.* ¶¶ 24-28, 44-45, 104.)  Second, the plaintiff claims

---

[5] The plaintiff first sought $15,452.16 from his sister, but subsequently informed the court that he was seeking $17,864.54.  (ECF No. 37-35 at 4.)

[6] On July 6, 2020, the plaintiff appealed this order, arguing that the court erred by not awarding him statutory interest and by not sanctioning his sister.  (ECF No. 37-41; 56.1 ¶ 68).  Although the appeal was pending by the time that the defendant moved for summary judgment in this case, the Appellate Division has since issued a decision affirming the Supreme Court's order.  *See Vogel v. Vogel*, 199 A.D.3d 597 (1st Dep't 2021).

that the defendant caused the plaintiff to be held in contempt of court in the state action. (*Id.* ¶¶ 48-56). Third, he alleges that the defendant failed to purge his contempt and that he was forced as a result to pay $62,338.19 in damages to his sister. (*Id.* ¶¶ 58-70). Finally, he claims that the defendant caused him to default on the receiver's accounting motion, and that the defendant did not take necessary steps to secure the money held by the receiver. (*Id.* ¶¶ 71-94).

With respect to damages, the plaintiff claims that he "would have received approximately $164,491 no later than January 1, 2015" (*id.* ¶¶ 108, 110(a)), and that he would not have been liable for an additional $62,338.19 in contempt damages (*id.* ¶ 107), or an additional $28,504.99[7] pursuant to the receiver's accounting. (*Id.*) Further, the plaintiff seeks $60,000 in legal fees, which he allegedly incurred to (i) vacate his default in opposing the contempt order to show cause, (ii) vacate his default on the receiver's accounting motion, and (iii) obtain the money due to him under the Israeli settlement agreement. (*Id.* ¶ 110(b).) He also seeks $14,500 in legal fees that he paid the defendant, and estimates that he is owed $35,000 for prospective "legal fees, costs and disbursements that the plaintiff will incur to obtain the balance of the money due to him[.]" (*Id.* ¶¶ 110(c)-(d).)

On September 29, 2021, the defendant moved for summary judgment. (ECF Nos. 35-38.) The plaintiff filed an opposition on October 20, 2021. (ECF No. 39.)

## LEGAL STANDARD

Summary judgment is appropriate if the parties' submissions—including pleadings, deposition transcripts, affidavits and other documents in the record—show that there is "no

---

[7] There is no clear basis in the record for the $28,504.99 figure that the plaintiff uses in the complaint. While the AC alleges that "the Receiver's Motion sought court approval of an accounting for the disbursement of the sum of approximately $28,504.99" (ECF No. 29 ¶ 74), the court in the state action found that "the total amount sought by and approved to the receiver in the accounting order [wa]s $23,192.61[.]" (*See* ECF No. 37-35 at 7 n.2.) The parties do not explain this apparent discrepancy.

genuine dispute as to any material fact," and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant has the burden of showing that no genuine dispute of material fact exists. *Coyle v. United States*, 954 F.3d 146, 148 (2d Cir. 2020).

A fact is "material" if it "might affect the outcome of the suit under the governing law," and a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The substantive law determines which facts are material and which facts are irrelevant. *See, e.g.*, *Liberty Lobby*, 477 U.S. at 248. While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citations omitted); *see also, e.g.*, *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11-12 (2d Cir. 1986), *cert. denied*, 480 U.S. 932 (1987).

The "mere existence of a scintilla of evidence in support of the [moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [moving party]." *Liberty Lobby*, 477 U.S. at 252. Moreover, the nonmoving party must do more than point to "some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). He must instead identify the "specific facts" that demonstrate a genuine issue for trial, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), and "offer some hard evidence showing that [his] version of events is not wholly fanciful," *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998). If the nonmoving party's "evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. *Liberty Lobby*, 477 U.S. at 249-50 (citation omitted).

**DISCUSSION**

Because the plaintiff is in federal court pursuant to diversity jurisdiction (*see* ECF No. 29 ¶ 8), I analyze his malpractice claim under state substantive law. *Rubens v. Mason*, 527 F.3d 252, 254 (2d Cir. 2008). "To prevail on a claim for legal malpractice in New York, a plaintiff must show: (1) that the attorney was negligent; (2) that the negligence was a proximate cause of the plaintiff's loss; and (3) proof of actual damages that were caused by the attorney's negligence." *L. Prac. Mgmt. Consultants, LLC v. M&A Couns. & Fiduciaries, LLC*, 599 F. Supp. 2d 355, 358 (E.D.N.Y. 2009); *see also Rubens*, 527 F.3d at 254-55.

To establish negligence, a plaintiff must show that the attorney's conduct "fell below the ordinary and reasonable skill and knowledge commonly possessed by a member of his profession." *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (internal quotation marks and citation omitted). "A complaint that essentially alleges either an 'error of judgment' or a 'selection of one among several reasonable courses of action' fails to state a claim for malpractice." *Id.* (quoting *Rosner v. Paley*, 65 N.Y.2d 736 (1985)). While expert testimony is often needed to establish the standard of care in the legal profession, it may be unnecessary where "the ordinary experience of the fact finder provides sufficient basis for judging the adequacy of the professional service." *Smartix Int'l Corp. v. Garrubbo, Romankow & Capese, P.C.*, No. 06-CV-1501, 2009 WL 857467, at *2 (S.D.N.Y. Mar. 31, 2009) (quoting *Northrop v. Thorsen*, 46 A.D.3d 780, 782 (2d Dep't 2007)).[8]

To establish the second element—causation—a plaintiff must show that "but for the malpractice, the plaintiff would have received a more advantageous result, would have prevailed in the underlying action, or would not have sustained some actual and ascertainable damage."

---

[8] In this case, the plaintiff submitted an expert witness report from Daniel Abrams, Esq. (*See* Expert Report of Daniel L. Abrams ("Abrams Report"), ECF No. 39-2.)

*Abrahami v. Meister Seeling & Fein LLP*, No. 21-CV-10203, 2022 WL 2066480, at *4 (E.D.N.Y. June 8, 2022) (internal quotation marks and citation omitted); *see also Brooks v. Lewin*, 21 A.D.3d 731, 733 (1st Dep't 2005).  As a practical matter, a court evaluating this element must "decide a lawsuit within a lawsuit:" to resolve the malpractice suit, the trier must examine "the events at issue [in the underlying suit] absent the alleged malpractice," *Prout v. Vladeck*, 316 F. Supp. 3d 784, 799 (S.D.N.Y. 2018) (internal quotation marks and citation omitted), and determine whether "a reasonable fact-finder in the underlying suit would have arrived at a different result but for the attorney's negligence," *Judd Burstein, P.C. v. Long*, No. 15-CV-5295, 2017 WL 3535004, at *6 (S.D.N.Y. Aug. 16, 2017), *aff'd*, 797 F. App'x 585 (2d Cir. 2019) (summary order) (internal quotation marks and citation omitted); *see also Rubens*, 527 F.3d at 255 ("To establish proximate cause, the client must meet a 'case within a case' requirement." (internal quotation marks and citation omitted)).

To satisfy the damages element of a malpractice claim, "a plaintiff must demonstrate actual and ascertainable damages." *Smartix*, 2009 WL 857467, at *2.  "Mere speculation of a loss resulting from an attorney's alleged omissions is insufficient to sustain a *prima facie* case sounding in legal malpractice." *Id.* (quoting *Luniewski v. Zeitlin,* 188 A.D.2d 642, 643 (2d Dep't 1992) (internal citation omitted)).

Although the question of malpractice "is ordinarily a factual determination to be made by the jury," *Greene v. Payne, Wood and Littlejohn*, 197 A.D.2d 664, 666 (2d Dep't 1993), summary judgment is appropriate "[w]here it is apparent that the attorney exercised reasonable judgment as to how to proceed, or where the client cannot establish another requisite element of the claim as a matter of law . . . ." *Stonewell Corp. v. Conestoga Title Ins. Co.*, 678 F. Supp. 2d 203, 209 (S.D.N.Y. 2010); *see also Rubens*, 527 F.3d at 255 ("In order for a defendant to

succeed on summary judgment, it must establish that 'that the plaintiff is unable to prove at least one of the essential elements [of legal malpractice].'" (quoting *Crawford v. McBride*, 303 A.D.2d 442, 442 (2d Dep't 2003))).

## I. The Claim that the Defendant Did Not Give the Plaintiff Appropriate Documents to Transfer His Interest in Accordance with the Israeli Settlement Agreement.

The plaintiff bases his first theory of legal malpractice on the defendant's alleged failure to give the plaintiff the necessary documentation to facilitate the transfer of his interest in the apartment to his sister. (ECF No. 29 ¶¶ 24-28, 44-45, 104; ECF No. 39-7 at 13, 17.) The plaintiff says that he would have gotten the money his sister owed him—approximately $164,491—no later than January 1, 2015, if the defendant had drafted and executed certain documents. The defendant, on the other hand, says that he advised the plaintiff that the Israeli settlement agreement was enforceable, and that he urged the plaintiff to comply with its terms; the plaintiff rejected his advice. (ECF No. 38 at 23-24.) The plaintiff's expert acknowledges that according to the record, the plaintiff "expressed reluctance to effectuate the transaction," but asserts that "[l]awyers faced with a reluctant or even seemingly intractable client are required to in exercising ordinary skill and care to not just encourage compliance, but also to advise the client of his legal obligation to follow the court's order[.]" (Abrams Report at 7.) Mr. Abrams opines that the defendant was negligent because he did not give the plaintiff an opportunity to sign the necessary paperwork, and did not provide "informed advice about whether to sign." (*Id.* at 7-9.)

The record shows that the defendant repeatedly advised the plaintiff that the Israeli settlement agreement was enforceable and that there "[wa]s no viable way to challenge" it. (*See* ECF No. 37-15 at 3.) Moreover, the defendant urged the plaintiff to sign documents in order to implement the transaction. On November 10, 2014, the defendant forwarded the plaintiff an

email from Ms. Vogel's attorney, Slava Hazin, in which Mr. Hazin wrote, "We can have the documents prepared and sent to your office for execution next week.  Please confirm that your client execute [sic] such documents."  (ECF No. 37-17 at 2.)  Four days later, the defendant responded to Mr. Hazin that he had "advised" the plaintiff to comply with the court's order, and that he was "awaiting [the plaintiff's] reply."  (ECF No. 37-18 at 3.)  On November 22, 2014, the defendant again advised the plaintiff that his "case [wa]s over in NY," and urged him to "execute [the] documents ASAP."  (ECF No. 37-19 at 2.)

Putting aside the question of whether the defendant was negligent—a tenuous allegation at best—the plaintiff has not raised a genuine issue of material fact as to causation.  The plaintiff has not met the "but for" test—that but for the so-called malpractice, the plaintiff would have signed a deed conveying his interest and obtained $164,491 by January 1, 2015.  To the contrary, the record shows that the plaintiff did not execute the documents necessary to comply with the Israeli settlement agreement because he did not want that agreement to go forward.  In October 2014, the plaintiff—represented by another lawyer in Israel—sought to undo the Israeli settlement agreement.  (ECF Nos. 37-12 at 2, 37-15 at 2.)  The record demonstrates he actively resisted his obligations under the Israeli settlement agreement, contrary to the defendant's advice, including in a July 31, 2015 email, in which the plaintiff told the defendant that he would rather be "put in jail" than sign the paperwork.  (56.1 ¶ 45; ECF No. 37-26 at 2.)  This is the very agreement that the plaintiff now says that the defendant should have enforced.

Under these circumstances, the plaintiff has not established the requisite causal connection between the defendant's conduct and the plaintiff's claimed damages.  *See Abrahami*, 2022 WL 2066480, at *4 ("It is well established that the causation requirement is a high bar to attorney malpractice liability and seeks to [e]nsure a tight causal relationship exists between the

claimed injuries and the alleged malpractice." (internal quotation marks and citations omitted)). Thus, the plaintiff's legal malpractice claim, to the extent it is premised on the defendant's unsuccessful efforts to transfer the plaintiff's interest in the apartment, must be dismissed. *See Smartix*, 2009 WL 857467, at *2 ("The failure to demonstrate proximate cause mandates the dismissal of a legal malpractice action regardless of whether the attorney was negligent." (quoting *Tydings v. Greenfield, Stein & Senior, LLP*, 43 A.D.3d 680, 682 (1st Dep't 2007))); *see also Ogier as Tr. for Thomas v. Rambadadt*, No. 20-CV-5163, 2022 WL 2657118, at *4 (E.D.N.Y. July 8, 2022).

## II. The Claim that the Defendant Did Not Oppose the Order to Show Cause in the State Action.

The defendant is also entitled to summary judgment on the plaintiff's second theory of malpractice liability—that the defendant did not oppose or seek to adjourn the order to show cause in the state action.  (ECF No. 29 ¶¶ 48-56.)

When the plaintiff chose not to follow the state court's order—that he transfer his interest in the apartment in exchange for $200,000 as required by the Israeli settlement agreement (56.1 ¶ 27)—the court ordered him in February 2015 to show cause why he should not be held in contempt of court.  (ECF No. 37-20.)  Although the defendant instructed the plaintiff to comply with the court's earlier ruling (ECF Nos. 37-18 at 3, 37-19 at 2) and claims that he advised the plaintiff about the contempt order (ECF No. 37-34 at 222-23), the record does not show that the defendant filed a written opposition.  The court held the plaintiff in contempt on June 15, 2015. (56.1 ¶ 36.)  According to the plaintiff's expert, "a reasonable attorney in the position of Mr. Rosenthal operating within the standard of care would have ensured that the client understood the seriousness of the contempt motion and encouraged immediate compliance, and considered a

number of possible options, including . . . seeking an adjournment as Mr. Vogel had requested . .

. or opposing the contempt motion on substantive grounds." (Abrams Report at 9-10.)

Even assuming that the defendant should have done as the expert suggests, the plaintiff

has not shown there is a material issue as to causation—in other words, whether the judge in the

state case would have reached a different result but for the defendant's negligence. *Prout*, 316 F.

Supp. 3d at 799. In New York, proving civil contempt for violating a court order requires a

showing "that the party charged with contempt had actual knowledge of a lawful, clear and

unequivocal order, that the charged party disobeyed that order, and that this conduct prejudiced

the opposing party's rights." *Martin v. Martin*, 163 A.D.3d 1139, 1141 (3d Dep't 2018) (internal

quotation marks and citation omitted). Once the movant establishes these elements by clear and

convincing evidence, "the burden shifts to the alleged contemnor to refute the movant's showing,

or to offer evidence of a defense, such as inability to comply with the order." *El-Dehdan v. El-

Dehdan*, 114 A.D.3d 4, 17 (2d Dep't 2013), *aff'd*, 26 N.Y.3d 19 (2015). A person cannot be

held in contempt of an order if he has no knowledge of the order. *Perfect Fit Indus., Inc. v.

Acme Quilting Co.*, 646 F.2d 800, 808 (2d Cir. 1981).

The plaintiff has not shown that he could have refuted any of the elements of contempt.

The court's directives, of which the plaintiff was aware, were clear and unambiguous. (*See* ECF

Nos. 37-16, 37-20.) Nor has the plaintiff shown that he could have asserted a viable defense in

opposing the order to show cause. And, even if the defendant could have gotten an adjournment

of the show cause hearing, there is no evidence that the result would have been any different,

given the evidence of the plaintiff's continued defiance of the court's order that he transfer his

interest in the apartment. Thus, the plaintiff has not met the "case within a case" requirement,

*see Rubens*, 527 F.3d at 255, and his malpractice claim based on the defendant's failure to

oppose the order to show cause must be dismissed. *See, e.g.*, *Ogier*, 2022 WL 2657118, at *4-5

(granting defendant's summary judgment motion in legal malpractice case where plaintiff could

not show that he would have succeeded in his underlying suit but for defendant's alleged

malpractice); *Alaimo v. Cohen*, No. 07-CV-7625, 2008 WL 4202267, at *6 (S.D.N.Y. Sept. 10,

2008) (defendant's failure to file a motion to vacate was not malpractice where plaintiff did not

show that the court in the underlying case "would have been sufficiently receptive to the

proposed motion to vacate so as to alter the disposition of the [] case").

**III. The Claim that the Defendant Did Not Purge the Plaintiff's Contempt, Causing Him to Pay $62,338.19 in Contempt Damages.**

The plaintiff's third theory of malpractice is that the defendant did not purge the

plaintiff's contempt by the July 30, 2015 deadline set by the court, which caused the plaintiff to

pay $62,338.19 in contempt damages.  (ECF No. 29 ¶¶ 58-70.)  The defendant is entitled to

summary judgment on this theory, as well.

"After a finding of contempt has been made, it is the contemnor's burden to demonstrate

that he or she has purged the contempt or that it is impossible for him or her to purge." *Riverside*

*Cap. Advisers, Inc. v. First Secured Cap. Corp.*, 57 A.D.3d 870, 871 (2d Dep't 2008).  It is true

that the plaintiff did not purge his contempt by July 30, 2015 (56.1 ¶ 39), but that was his choice.

As discussed above, the record before and after the purge date confirms that the plaintiff did not

want to transfer his interest in the apartment to his sister, despite the defendant's advice to the

contrary.  (ECF Nos. 37-22 at 2, 37-26 at 2.)  The plaintiff also testified that as of June 25, 2015,

he was not "ready to sign the deed over to [his] sister" because he was still litigating his

challenge to the Israeli settlement agreement in Israel.  (ECF No. 37-13 at 105-06.)  Under these

circumstances, the plaintiff has not established that the defendant's alleged negligence was the

cause of any loss he suffered.

Similarly, the plaintiff cannot establish that but for the defendant's alleged malpractice, he would have paid less than the $62,338.19 in contempt damages, which is what he agreed to pay during the March 17, 2016 hearing. "A claim for legal malpractice is viable, despite settlement of the underlying action, if it is alleged that settlement of the action was effectively compelled by the mistakes of counsel." *Bernstein v. Oppenheim & Co., P.C.*, 160 A.D.2d 428, 430 (1st Dep't 1990). The plaintiff's allegations about the defendant's performance at the damages hearing are refuted by the plaintiff's own allocution, in which he confirmed that he agreed to the settlement voluntarily, and that no one forced or compelled him to accept its terms. When the judge asked if he was satisfied with his attorney's services, the plaintiff replied, "My attorney is okay; he has good service. The only thing, you know, he has his own mind, like I have my own mind, and he's entitled to." (ECF No. 37-31 at 8-19); *see, e.g.*, *Katebi v. Fink*, 51 A.D.3d 424 (1st Dep't 2008) (plaintiff's testimony that he was satisfied with services of her attorney contradicted allegations of attorney malpractice); *Katz v. Essner*, 136 A.D.3d 575, 576 (1st Dep't 2016) (same).

In short, the plaintiff actively resisted complying with the court's order that he sign his interest in the apartment to his sister, and ignored the defendant's advice. The plaintiff's speculation that he would have settled the issue for less or not have agreed to pay $62,338.19 in contempt damages "is insufficient to establish causation." *Allegrino v. Ruskin Moscou Faltischek, P.C.*, No. 21-CV-484, 2021 WL 5500084 (2d Cir. Nov. 24, 2021) (summary order); *Smartix*, 2009 WL 857467, at *2. Thus, the plaintiff has not raised a question of fact regarding causation. *See Rubens*, 527 F.3d at 255.

## IV. The Claim that the Defendant Caused the Plaintiff to Default on the Receiver's Motion and to Expend an Additional $60,000 in Litigation Expenses.

The plaintiff also maintains that the defendant caused him to default on the receiver's accounting motion, and that the defendant is responsible for $60,000 in attorney's fees and costs that the plaintiff incurred to recover "the money that belonged to him under the Israeli Settlement Agreement" from the receiver.  (ECF No. 29 ¶¶ 71-94).

In a legal malpractice action, damages must be "actual and ascertainable." *Rudolf v. Shayne, Dachs, Stanisci, Corker & Sauer*, 8 N.Y.3d 438, 442 (2007).  They are designed "to make the injured client whole." *Id.* (quoting *Campagnola v. Mulholland, Minion & Roe*, 76 N.Y.2d 38, 42 (1990)).  A plaintiff may recover "litigation expenses incurred in an attempt to avoid, minimize, or reduce the damages caused by the attorney's wrongful conduct." *Id.* (quoting *DePinto v. Rosenthal & Curry*, 237 A.D.2d 482, 482 (2d Dep't 2007)) (awarding legal fees and litigation expenses incurred in attempt "to correct defendants' error").

The receiver in the state action filed an accounting motion on August 18, 2017.  (56.1 ¶ 56.)  The defendant concedes that he did not oppose the motion but says that he "never received th[e] motion."  (56.1 ¶ 58; ECF No. 37-34 at 252.)  Before the court decided the motion, the plaintiff hired new counsel, who thereafter moved to vacate the default and opposed the accounting.  (56.1 ¶ 58; ECF No. 37-35 at 6.)  The court vacated the default but approved the accounting.  (ECF No. 37-38.)

The defendant concedes that the plaintiff's only possible claim is for the attorney's fees that he spent on "the limited portion of his motion to vacate his default[.]"  (ECF No. 38 at 33.)  The defendant maintains, however, that that because the New York Supreme Court did not modify the accounting, then "logically" he "cannot be held accountable for new counsel's lack of success in opposing the receiver's motion."  (*Id.* at 32.)  But he cites no authority for this

proposition, and does not argue that the new lawyer's opposition to the accounting was somehow frivolous or improper. On the contrary, a malpractice plaintiff can recover attorney's fees associated with a "proper effort to mitigate damages even though it proves unsuccessful." *Baker*, 239 F.3d at 426-27 (brackets and citation omitted) (holding that legal fees that plaintiff paid to his new counsel "were incurred in consequence of [defendant's] malpractice because the appeal attempted to repair the harm done by the malpractice," and finding it "of no consequence that the appeal failed"); *I.M.P. Plumbing & Heating Corp. v. Munzer & Saunders, LLP*, 199 A.D.3d 569, 570 (1st Dep't 2021) (finding that the legal fees the plaintiff paid to oppose motions due to defendant's "failure to interpose answers" were recoverable, and holding that "[i]ssues of fact exist as to the amounts, if any, that plaintiffs paid").

In this case, there are material issues about whether the defendant's failure to respond to the receiver's motion constituted negligence, caused the plaintiff to default and resulted in litigation expenses necessary to vacate the default and to oppose the accounting.[9] Thus, there is a genuine factual dispute about whether the plaintiff "would not have incurred any damages, but

---

[9] Citing a document with Mr. Zanani's time entries, the defendant contends that "Mr. Zanani's maximum time expended on the motion to vacate the default and opposition to the accounting, along with the oral argument, was 23.25 hours." (Def.'s Rule 56.1 Statement, ECF No. 36 ¶ 60.) The plaintiff disputes this allegation, pointing out that the defendant does not identify the specific entries that purportedly add up to 23.25 hours, and in any event, the time entries do not account for all of Mr. Zanani's work. (56.1 ¶ 60.) I need not resolve at this stage the amount of time that Mr. Zanani spent in vacating the plaintiff's default and opposing the accounting. *See, e.g.*, *Smartix*, 2009 WL 857467, at *4 (denying defendant's motion summary judgment on plaintiff's legal malpractice claim and deferring the calculation of legal fees associated with the defendant's negligence, finding "it is likely that the amount billed to the plaintiff in connection with the sanctions hearing may be ascertained without much difficulty").

for the lawyer's negligence." *Rudolf*, 8 N.Y.3d at 442.[10]  Accordingly, summary judgment is not warranted on the legal malpractice claim that the defendant caused the plaintiff to default on the receiver's accounting motion.

## CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment is granted in part and denied in part.

**SO ORDERED.**

s/Ann M. Donnelly

_____
ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
　　　  September 14, 2022

---

[10] Although the Appellate Division on May 7, 2019 eventually adjusted the accounting in the plaintiff's favor, *see Vogel*, 172 A.D.3d at 464, the plaintiff cannot show that the fees he paid Mr. Zanani on that appeal were "incurred in consequence of [the defendant's] malpractice" and are thus recoverable. *Baker*, 239 F.3d at 427.  Moreover, the plaintiff cannot recover legal expenses associated with his subsequent appeal of the court's April 28, 2020 order, as these alleged damages are "speculative or their amount and nature are unprovable."  *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1104 (2d Cir. 1988) (citations omitted).  In any event, the plaintiff has not adequately explained why those litigation costs are attributable to the defendant's acts or omissions.